EXHIBIT A

GARDA

Contract: 140-094869

## ARMORED CAR SERVICE AGREEMENT WITH CASH PROCESSING

This Agreement is made on August 1, 2009 by and between Garda CL Atlantic, Inc. FKA AT Systems Atlantic, Inc. (Hereinafter called "CARRIER") and VIRGINIA CREDIT UNION whose address is **PO BOX 90010, RICHMOND, VA 23225** (Hereinafter called "CUSTOMER").

### SECTION I: BASIC AGREEMENT

The Parties both agree as follows:

1. **Service:** CARRIER agrees to render Services to CUSTOMER at the locations, times, prices, frequencies and liability limits set forth on Schedule A, attached hereto and made a part hereof, and upon such other terms and conditions as are set forth on Schedule A.

2. **Insurance:** During the term of this Agreement, CARRIER shall maintain the insurance in the amounts and types set forth in Section VIII hereof.

3. **Maximum Liability:** The Maximum Shipment Liability shall be as set forth in Section X hereof.

4. **Term:** The Term for Services under this Agreement shall be as set forth on Schedule A.

5. **Payment for Services:** CUSTOMER agrees to pay CARRIER for the Services the sum set forth on Schedule A per month, plus all additional charges associated with special Service requests and any applicable surcharges pursuant to the terms hereof.

6. **Entire Agreement:** This Agreement includes the terms hereof and the terms of Schedule A.

### SECTION II. DEFINITIONS.

(a) The word "Holiday" as used in this Agreement shall mean the days designated on Schedule A. Holiday Service will be provided at the prices set forth on Schedule A.

(b) The word "Property" shall mean currency, coins, precious metals, checks, notes, bonds, negotiable instruments, securities and all other things of value but excluding hazardous materials or materials for which transport is legally prohibited or restricted by applicable State or Federal Law.

(c) The word "Sealed" as used in this Agreement shall mean closed in a manner that is reasonably designed to prevent easy access to the Property and that under normal circumstances would tend to reveal evidence of tampering or manipulation if unauthorized access were attempted.

(d) The word "Service" shall mean to call for Sealed Shipments said to contain Property, to receipt therefor, to perform any cash processing services and to deliver such funds to CUSTOMER's designated bank, either by ACH transfer or by armored transport, and to perform any EvenXchange or other services set forth below or on Schedule A.

(e) The word "Shipment" as used herein shall mean the total Property in Sealed containers received by CARRIER at a single location from a single consignor for delivery to one other location to a single consignee.

(f) The words "Reconstruct", "Reconstructed" and "Reconstruction" shall mean to identify checks only to the extent of determining the face amount of said checks and the identity of the maker and/or check numbers, account numbers, routing numbers, financial institution, and the identity of the maker and the endorser of each.

(g) The term "Change Order" shall mean a request for specific denominations of coin and currency to be delivered to CUSTOMER's individual store locations as a part of CARRIER's EvenXchange Services as specified below.

(h) The term "Change Payment " is a sum equal to the amount of a Change Order to be exchanged with CARRIER by CUSTOMER at the time of delivery of each respective Change Order at each of CUSTOMER's store locations as a part of CARRIER's EvenXchange Services as specified below.

GARDA

## SECTION III. ARMORED TRANSPORTATION SERVICE.

(a) Service. CARRIER agrees to render Service to CUSTOMER at the locations, prices, frequencies and liability limits set forth in Schedule A attached hereto and made a part hereof and upon such other terms and conditions as are set forth on Schedule A.

(b) Premise Time: CUSTOMER understands that time is of the essence to CARRIER'S business. Therefore, CUSTOMER agrees that CARRIER'S messenger shall be present no more than a maximum of five (5) minutes to make a pickup and/or delivery of Property. If said premise time exceeds the time stated herein, it is agreed that the messenger may leave and that such departure shall not be a breach of this Agreement. CUSTOMER may call and request that a Service call be made by CARRIER subsequent to such departure. By requesting same, CUSTOMER agrees to pay for said additional Service call at a rate to be established by mutual agreement, such charges to be in addition to regular Service charges.

## SECTION IV. CASH PROCESSING SERVICE

(a) The Cash Processing Services are coin and currency deposit verifications. CARRIER agrees to process and verify all the CUSTOMER's cash deposits as described below and in accordance with any requirements set forth on Schedule A.

(b) Deposit Processing: CARRIER will receive Sealed containers from CUSTOMER. Upon delivery thereof to CARRIER's vault, CARRIER shall process the deposits picked up by CARRIER from CUSTOMER locations. In accordance with CUSTOMER'S selection on Schedule A, CARRIER will then deliver the processed currency either (i) electronically to the designated bank account of CUSTOMER in accordance with this Agreement and the ACH Instructions provided by CUSTOMER, or (ii) via armored transportation to CUSTOMER'S designated consignee.

(c) CUSTOMER will be responsible for differences found by CARRIER during CARRIER's verification of CUSTOMER's store deposits, unless substantial evidence of CARRIER tampering is found.

(d) EvenXchange® Service:

(i) EvenXchange® Service CARRIER agrees to accept Change Orders directly from CUSTOMER location(s) via CARRIER'S telephone order entry system or web entry system, and CARRIER will prepare and package each order from the inventory ("Inventory") of coin and currency (hereafter, collectively "Cash") maintained at CARRIER'S facility(ies). Subject to the terms herein, CARRIER shall deliver Change Orders in accordance with the scheduled pickup/delivery dates set forth in the attached Schedule A. Change Orders requested by CUSTOMER for delivery on days other than scheduled pickup/delivery dates shall be subject to CARRIER approval and such special charges as provided herein, or as otherwise mutually agreed upon. All Change Orders must be placed before 11:00 a.m. on the day prior to a requested/scheduled delivery. Saturday, Sunday and Monday Change Orders must be placed before the above-referenced time on Friday. CUSTOMER shall not order any currency in denominations exceeding Ten Dollar ($10.00) notes.

(ii) EvenXchange Procedures: The parties agree that CUSTOMER shall procure an Inventory of Cash which shall be maintained at CARRIER'S facilities in amounts by denomination to fulfill the change order requirements set forth herein. CARRIER shall deliver CUSTOMER Change Orders, subject to the terms herein, to CUSTOMER store locations and CUSTOMER store locations shall contemporaneously provide CARRIER'S messenger with a Change Payment, in the Sealed, tamper-resistant bag provided by CARRIER, in an aggregate amount equal to the face amount of the Change Order. CARRIER shall have no obligation to provide CUSTOMER with a Change Order unless CUSTOMER strictly complies with the foregoing currency exchange obligations. CUSTOMER agrees that CARRIER may adjust the amount of the next Change Order delivery by a sum equal to the amount of any discrepancy in the Change Payment by location where there is a discrepancy. Absent evidence of CARRIER tampering, CUSTOMER will be responsible for differences found by CARRIER during CARRIER'S verification of any CUSTOMER Change Payment.

## SECTION V. ACH SERVICE

(a) ACH Delivery: If ACH delivery is selected by CUSTOMER, following CARRIER'S completion of the Cash Processing Services, CARRIER shall deposit the verified deposit funds ("Verified Funds") into a

GARDA

designated account of CARRIER for the purpose of making the ACH transfer to CUSTOMER at CUSTOMER'S designated bank ("CUSTOMER'S Bank"). At no point will any of the Verified Funds placed into any account owned by CARRIER prior to the completion of the ACH electronic funds transfer transaction be or become the property of CARRIER. CARRIER shall cause the Verified Funds to be electronically transferred to CUSTOMER'S account with CUSTOMER'S Bank not later than the second business day following the receipt of the Verified Funds by CARRIER.

(b) CUSTOMER ACH Deliverables: CARRIER'S obligations hereunder will be contingent upon the delivery to CARRIER by CUSTOMER of the following:

(i) All requisite authorizations required by the NACHA Rules, Regulation E and any other applicable law; and

(ii) ACH instructions for the transfer of the Verified Funds to CUSTOMER'S account with CUSTOMER'S Bank through the ACH network. Such ACH instructions will be delivered to CARRIER no later than two (2) weeks prior to the first ACH transfer to CUSTOMER'S account with CUSTOMER'S Bank and two (2) weeks prior to any change in CUSTOMER'S account or CUSTOMER'S Bank.

(c) ACH Representations and Warranties: Each party represents and warrants the following:

(i) The party's execution, delivery and performance of the ACH-related services: (A) have been authorized by all necessary corporate action, (B) do not violate the terms of any law, regulation or court order to which such party is subject or the terms of any material agreement to which the party or any of its assets are subject, and (C) are not subject to the consent or approval of any third party;

(ii) This Agreement, including the ACH provisions, is the valid and binding obligation of the representing party, enforceable against such party in accordance with its terms; and

(iii) Such party is not subject to any pending or threatened litigation or governmental action that could interfere with such party's performance of its obligations hereunder.

(d) CARRIER ACH Liability:

(i) Maximum Liability: Except as otherwise provided herein, CARRIER will be liable for loss of up to the amount of the Verified Funds that are the subject of the ACH electronic funds transfer transaction from the time the deposit funds are picked up at CUSTOMER'S location until the time that the Verified Funds ACH transfer is received into CUSTOMER'S account at CUSTOMER'S Bank.

(ii) Limitation of Liability:

(A) Neither party will be liable to the other for any special, indirect, incidental, consequential, punitive or exemplary damages related to the loss of Property (including Verified Funds), including, but not limited to, lost profits, even if such party has knowledge of the possibility of such damages.

(B) The bank providing ACH services in connection with this Agreement will have no liability to CUSTOMER for the ACH services performed hereunder.

## SECTION VI. REPORTING

CARRIER agrees to electronically provide information to CUSTOMER each business day for the deposits that were processed on the previous business day so that CUSTOMER can update its records.

## SECTION VII. INVESTIGATION

The parties agree to fully cooperate with one another when an investigation is deemed necessary to determine responsibility and reach a mutually agreed upon resolution. CARRIER and CUSTOMER agree to retain any bag, seal, tag, or strap of any Shipment of a questionable nature in which a difference or discrepancy is found. CARRIER shall not be responsible for any claim made more than 90 days from the date the Cash Processing Service was performed.

## SECTION VIII. INSURANCE.

(a) All Risk Insurance: CARRIER agrees at all times during the life of this Agreement to purchase and maintain Insurance with a responsible insurance company to cover the loss or destruction of Property

GARDA

handled or protected by CARRIER, its agents or employees, on behalf of CUSTOMER pursuant to this Agreement. CARRIER agrees to furnish CUSTOMER with written evidence of compliance with this provision. It is understood and agreed that CARRIER shall not be liable in any capacity for loss or harm to CUSTOMER'S Property or for damages directly and/or proximately flowing from loss or harm to CUSTOMER'S Property while said Property is in the possession of CARRIER (nor shall CARRIER'S insurance carrier be required to cover such damages) when same are caused by any of the following:

1. Hostile or warlike action in time of peace or war, including, but not limited to, action which hinders, combats or defends against an actual, impending or expected attack by any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces, or by military, naval or air forces, or by an agent of any government power, authority or force;

2. Any weapon of war employing atomic fission or radioactive force, whether in time of peace or war;

3. Any accident or catastrophe occurring at a government or private facility employing the use of atomic fission or radioactive energy, whether in time of peace or war;

4. Insurrection, rebellion, revolution, civil war, usurped power, or action taken by government authority in hindering, combating, or defending against such an occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transport or trade.

(b) Other Insurance: CARRIER shall maintain during the performance of the Services the following insurance.

(i) Worker's Compensation and Employers' Liability Insurance as prescribed by applicable law.

(ii) Comprehensive or Commercial General Liability Insurance (bodily injury and property damage), the limits of liability of such Insurance shall not be less than $ 1,000,000 combined single limit per occurrence.

(iii) Automobile Bodily Injury and Property Damage Liability Insurance, covering owned, non-owned and hired automobiles, the limits of which shall not be less than $ 1,000,000 combined single limit per occurrence.

## SECTION IX. CUSTOMER INDEMNITY

(a) Indemnity: CARRIER agrees to defend, indemnify and hold harmless CUSTOMER from all claims, demands, actions and causes of action for damage or injury, including death, that are hereafter made or brought against CUSTOMER by any third party for the recovery of actual damages to the extent caused by the negligence or willful misconduct of CARRIER, or its employees or agents. CARRIER shall have no defense or indemnification obligation to CUSTOMER to the extent such damage or injury is caused by the negligence or willful misconduct of CUSTOMER, or its employees or agents. In no case shall CARRIER be liable for or owe any duty of indemnification with respect to any exemplary, punitive or consequential damage claims by CUSTOMER or any third party arising from the loss or destruction of Property. CARRIER'S obligation with respect to any claim for damages by CUSTOMER or any third party with respect to any Property shall not exceed the Maximum Shipment Liability.

## SECTION X. CARRIER LIABILITY

(a) Maximum Shipment Liability: Except as provided above, it is understood and agreed that CARRIER and its insurance company will be liable for loss of or damage to CUSTOMER Property inclusive of reconstructive damage up to the maximum sum for each Shipment as set forth in Schedule A, which sum is the agreed maximum value of any single Shipment ("Maximum Shipment Liability"). The Service and liability obligations assumed by CARRIER and the rates charged by CARRIER are based, in part, upon the values of shipments as declared herein by CUSTOMER. It is therefore expressly agreed by CUSTOMER that the provisions of this Agreement dealing with Maximum Shipment Liability to be accepted by CARRIER from CUSTOMER for delivery to consignee, or from consignee, may not be waived or amended by any agent of CARRIER, but that such waiver or amendment may be made only with the written consent of an officer of CARRIER. CARRIER will not be liable for loss or damage to Property consigned to it in excess of the Maximum Shipment Liability unless CUSTOMER has paid all excess liability charges to CARRIER for all Shipments of Property with a value in excess of the Maximum Shipment Liability amount.

(b) Force Majeure: CARRIER shall not be in breach of this contract nor be liable in any capacity for damages, including but not limited to loss of interest, directly and/or proximately flowing from any delay in or

GARDA

failure to make pickups or deliveries on CUSTOMER'S behalf pursuant to the terms of this Agreement due to causes beyond CARRIERS reasonable control including but not limited to: strikes, work stoppages, lockouts, epidemics, pestilence, war, rebellion, insurrection, hostilities, legal process, court action, mechanical failure, accidents, fires, acts of God, storms, flood, closed transportation routes or closure of necessary banking system resources. It is understood and agreed that CARRIER is not a guarantor of any pickup or delivery times that may be established from time to time by custom, practice or agreement. Any such times are mere approximations or estimates, however, CARRIER agrees to use reasonable efforts to accommodate pickup and delivery times requested by CUSTOMER and agreed to by CARRIER.

**SECTION XI. PROCEDURES.**

(a) Authorized Messengers: CARRIER agrees to furnish CUSTOMER with the certified signature and photograph of each authorized messenger, and to give written notice in the event of revocation of such authority. CARRIER assumes no liability for Property delivered to any person other than an authorized messenger whose unrevoked signature is on file with CUSTOMER.

(b) Shipment Requirements: CUSTOMER agrees to cause all Shipments to be made by means of CUSTOMER placing CUSTOMER'S Property in Sealed packages or containers, of a mutually agreed upon type and design, which clearly and distinctly indicate the name and address of the consignor as well as the name and address of the consignee. CUSTOMER further agrees to clearly and distinctly set forth the value of each Shipment on the outside of the Sealed packages or containers. CUSTOMER agrees that CARRIER, and its agents and employees, may refuse to pickup Shipments of Property which are not Sealed and properly marked by CUSTOMER as set forth above and that CARRIER assumes no liability for any damages or loss which may result as a consequence of such refusal to make a pickup. The parties agree that, while CUSTOMER may keep its own receipt and log book for its own internal purposes, CARRIER's receipt document shall be deemed the sole controlling document with respect to all Services rendered, including, without limitation, deposits delivered and received, timing, losses, shortages, overages, investigations, claims or litigation.

(c) Duration of Shipment Liability: CARRIER'S possession of CUSTOMER'S Shipment begins only after an authorized messenger employed by CARRIER signs a receipt for and receives said Shipment into his/her physical custody. Thereafter, CARRIER'S possession of CUSTOMER'S Property terminates when the ACH transmission is completed, when and as CUSTOMER'S consignee receives physical custody of the Shipment or when CUSTOMER takes possession of the Change Order. It is understood and agreed that CARRIER'S liability for the handling or protection of CUSTOMER'S Property arises and exists solely and concurrently with CARRIER'S possession thereof.

(d) Consequential Damages: It is understood and agreed that under no circumstances or theory of liability shall CARRIER and/or CARRIER'S insurance company be liable for any incidental or consequential damages to CUSTOMER or any third party directly or on behalf of CUSTOMER resulting from or occasioned by the loss of or damage to any Shipment of Property delivered to CARRIER pursuant to this Agreement.

(e) Claims: It is understood and agreed that under no circumstances shall CARRIER and/or CARRIER'S insurance company be liable or responsible for any claim for loss of or damages to CUSTOMER'S Property which is not submitted in writing to CARRIER within the greater of ninety (90) days after the date that said loss or damage purportedly occurred or the minimum notice requirement under the law of the jurisdiction where the Service took place. Within thirty (30) days after the giving of written notice of a claim of loss or damage, CUSTOMER agrees to furnish CARRIER a detailed written statement of the circumstances surrounding such loss or damages as well as detailed written proof of such loss or damages in form reasonably satisfactory to CARRIER, which proof of loss shall be substantiated by the books, records and accounts of CUSTOMER and shall be subscribed and sworn to by CUSTOMER or its duly authorized officer. Failure of CUSTOMER to comply with the foregoing shall relieve and release CARRIER of any liability to CUSTOMER with respect to such claimed loss or damage.

(f) Checks. CUSTOMER shall maintain an accurate record of all checks placed in any Shipment given to CARRIER and in the event of a loss, CUSTOMER agrees to promptly, diligently and completely cooperate with CARRIER in the Reconstruction and replacement of lost, destroyed or stolen checks which had been contained in any such Shipment. CARRIER'S sole liability shall be the payment to CUSTOMER of: (i) reasonable costs necessary to Reconstruct the checks plus any necessary costs because of stop payment procedures; and (ii) the face value of checks that cannot be Reconstructed (not to exceed $5,000 per Shipment), provided adequate proof of the value thereof is presented to CARRIER, and excluding those checks that would not have been collectable at the time of loss. The maximum liability of CARRIER for the checks shall in no event exceed the Maximum Shipment Liability Checks limit set forth in Schedule A, which includes the aforesaid $5,000.00 for the checks that cannot be Reconstructed. Complete cooperation shall include but not be limited to, recovery of hard copy or electronic records of checks including, without limitation, point of sale information created by its employees, agents or customers; as well as, requests by CUSTOMER to makers of the missing checks to issue duplicates and in the event the makers refuse to do so, then to assert all of its legal and equitable rights against said makers. CUSTOMER agrees that CARRIER and

GARDA

CARRIER'S insurance company shall not be liable for damages directly or proximately flowing from CUSTOMER'S breach of this provision. Upon payment of a loss pursuant to this Agreement, CARRIER or its insurance company shall be subrogated to all CUSTOMER'S rights and remedies of recovery therefor. CUSTOMER shall assign to CARRIER CUSTOMER'S right to receive payment under any check(s) for which CARRIER has reimbursed CUSTOMER and CUSTOMER shall execute any document necessary or reasonably desirable to perfect and accomplish such assignment.

**SECTION XII. GENERAL.**

(a) Payment for Services: CUSTOMER agrees to pay CARRIER for the Services the sum set forth on Schedule A per month, plus all additional charges associated with special Service requests. Payment is due net 30 days from the date of any invoice. CUSTOMER understands and agrees that CARRIER reserves the right to charge the lesser of 1.5 percent or the highest rate permitted by applicable law, per month or fraction thereof, finance charge on all balances that are not paid within 30 days of the date of invoice. CUSTOMER further understands and agrees that CARRIER shall not be responsible to issue credits for erroneous billings that are more than ninety (90) days old as of the date the credit is requested. The prices quoted on Schedule A do not include state sales and transportation-related taxes, local sales and transportation-related taxes or federal sales and transportation-related taxes.

(b) Cost Increases: CARRIER reserves the right to adjust the fees for services set forth hereunder on Schedule A at any time after the first year of the Agreement upon thirty (30) days advance written notice. CARRIER shall have the right to charge a surcharge for fuel or insurance cost increases, as applicable upon thirty (30) days initial advance notice.

(c) Integration, etc.: This Agreement shall become effective only when approved and signed by authorized representatives of the parties hereto. This Agreement, including all attachments, schedules and exhibits constitutes the entire agreement and understanding between the parties related to the subject matter hereof, and no representations, inducements, promises or agreements not embodied herein shall be of any force and effect. This Agreement shall be binding in accordance with its terms upon the parties hereto and their respective transferees, assigns and successors in interest; provided, however, this Agreement may be assigned by CARRIER to any parent, subsidiary, or affiliated corporation which it may hereafter acquire or with which it may be merged or consolidated, or to any corporation acquiring the business and assets of CARRIER, but this Agreement shall not be otherwise assigned by either party hereto without the prior express written consent of the other party, which consent shall not be unreasonably withheld. This Agreement may be altered, amended, or superseded solely by means of a writing signed by the parties hereto. The headings hereof are for convenience only and have no bearing on the interpretation of the terms of the Agreement.

(d) Jurisdiction. The parties agree that the terms of this Agreement shall be governed by and construed In accordance with the laws of the State of California.

(e) Change in Conditions. CARRIER may increase the charges set forth in Schedule A upon written notice to CUSTOMER in the event of a change in economic conditions beyond CARRIER's reasonable control that increases the operating costs Incurred by CARRIER.

| **Carrier** | **Customer** |
|---|---|
| Garda CL Atlantic, Inc. | VIRGINIA CREDIT UNION |
| By: David Rugani (Signature) | By: William R. Jones (Signature) |
| David Rugani (Printed Name) | William R. Jones (Printed Name) |
| Title: Contracts Administration | Title: SVP Operations |

GARDA

Schedule A

| FOR OFFICE USE ONLY | |
|---|---|
| Customer Account: VIRGINIA CREDIT UNION | Contract: 140-094869 |

Garda CL Atlantic, Inc. FKA AT Systems Atlantic, Inc. ("CARRIER") and VIRGINIA CREDIT UNION ("CUSTOMER") agree that effective August 4, 2009, this Schedule A amends and is incorporated into the armored car service agreement between the parties (the "Agreement") dated as of August 1, 2009 (the "Contract Date") by adding or amending the following customer rates, schedules, lists, liabilities, days, term and/or terms.

**(I) Term**

The Agreement shall be in full force and effect from August 1, 2009 until August 1, 2012 and shall automatically renew thereafter from year to year until cancelled by either party by giving the other party written notice thereof thirty (30) days in advance of each anniversary of the Contract Date.

**(II) Holidays**

CUSTOMER acknowledges that CARRIER observes the following holidays for which a Holiday Service rate as set forth in Section III below shall apply.

(1) New Years Day
(2) Martin Luther King Day
(3) Presidents Day
(4) Easter
(5) Memorial Day
(6) Independence Day
(7) Labor Day
(8)Columbus Day
(9) Veteran's Day
(10) Thanksgiving Day
(11) Christmas Day
(12) Family Day (NV Only)
(13) Admission Day (NV Only)
(14) Pioneer Day (UT Only)

It is understood and agreed that when a holiday falls on a Sunday the following Monday shall constitute the holiday; when a holiday falls on a Saturday the preceding Friday, that Saturday, or the following Monday shall constitute the holiday.

**(III) Delivery Options**

CARRIER shall deliver CUSTOMER'S deposits (check one):

☐ via ACH transfer ☐ via armored transportation

**(IV) Service Location(s) and Service Detail(s)**

| Status | **Effective Date | **Service Location | **Address | City | State | **Product | **Monthly Price | Item Allowance | Liability Limit |
|---|---|---|---|---|---|---|---|---|---|
| Active | 11/1/2008 | VIRGINIA CREDIT UNION | 720 E BROAD ST | RICHMOND | VA | Armored Transportation | $196.62 | 10 | $300,000.00 |
| Active | 10/1/2008 | VIRGINIA CREDIT UNION | 720 E BROAD ST | RICHMOND | VA | Coin Wrap Service . | $0.00 | 0 | $300,000.00 |
| Active | 11/1/2008 | VIRGINIA CREDIT UNION | 2300 W BROAD ST | RICHMOND | VA | Armored Transportation | $196.62 | 10 | $300,000.00 |
| Active | 10/1/2008 | VIRGINIA CREDIT UNION | 2300 W BROAD ST | RICHMOND | VA | Coin Wrap Service . | $0.00 | 0 | $300,000.00 |
| Active | 11/1/2008 | VIRGINIA CREDIT UNION | 101 N 14TH ST | RICHMOND | VA | Armored Transportation | $196.62 | 10 | $300,000.00 |
| Active | 10/1/2008 | VIRGINIA CREDIT UNION | 101 N 14TH ST | RIVHMOND | VA | Coin Wrap Service . | $0.00 | 0 | $300,000.00 |
| Active | 11/1/2008 | VIRGINIA CREDIT UNION | 6103 Brashier Blvd | Mechanicsville | VA | Armored Transportation | $196.62 | 10 | $300,000.00 |
| Active | 10/1/2008 | VIRGINIA CREDIT UNION | 6103 Brashier Blvd | Mechanicsville | VA | Coin Wrap Service . | $0.00 | 0 | $300,000.00 |
| Active | 11/1/2008 | VIRGINIA CREDIT UNION | 5427 GLENSIDE RD | RICHMOND | VA | Armored Transportation | $270.21 | 10 | $300,000.00 |
| Active | 10/1/2008 | VIRGINIA CREDIT UNION | 5427 GLENSIDE RD | RICHMOND | VA | Coin Wrap Service . | $0.00 | 0 | $300,000.00 |
| Active | 11/1/2008 | VIRGINIA CREDIT UNION | 1200 KOGER CENTER BLVD | RICHMOND | VA | Armored Transportation | $270.21 | 10 | $300,000.00 |
| Active | 10/1/2008 | VIRGINIA CU | 1200 KOGER CENTER BLVD | RICHMOND | VA | Coin Wrap Service . | $0.00 | 0 | $300,000.00 |
| Active | 11/1/2008 | VIRGINIA CREDIT UNION | 11030 HULL STREET RD | MIDLOTHIAN | VA | Armored Transportation | $196.62 | 10 | $300,000.00 |
| Active | 10/1/2008 | VIRGINIA CU | 11030 HULL STREET RD | MIDLOTHIAN | VA | Coin Wrap Service . | $0.00 | 0 | $300,000.00 |
| Active | 11/1/2008 | VIRGINIA CREDIT UNION | 4001 LAUDERDALE DR | RICHMOND | VA | Armored Transportation | $196.62 | 10 | $300,000.00 |
| Active | 10/1/2008 | VIRGINIA CU | 4001 LAUDERDALE DR | RICHMOND | VA | Coin Wrap Service . | $0.00 | 0 | $300,000.00 |

GARDA

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Active | 11/1/2008 | VIRGINIA CU (RS6000) | 10165 BROOK RD | RICHMOND | VA | Armored Transportation | $196.62 | 10 | $300,000.00 |
| Active | 10/1/2008 | VIRGINIA CU | 10165 BROOK RD | RICHMOND | VA | Coin Wrap Service . | $0.00 | 0 | $300,000.00 |
| Active | 11/1/2008 | VIRGINIA CU (RS6000) | 301 Temple Lake Dr | Colonial Heights | VA | Armored Transportation | $196.62 | 10 | $300,000.00 |
| Active | 10/1/2008 | VIRGINIA CU | 301 Temp Lake Dr | Colonial Heights | VA | Coin Wrap Service . | $0.00 | 0 | $300,000.00 |
| Active | 11/1/2008 | VACU Farmville #16 | 100 Mid Town Ave | Farmville | VA | Armored Transportation | $797.22 | 10 | $300,000.00 |
| Active | 10/3/2007 | VACU Farmville #16 | 100 Mid Town Ave | Farmville | VA | Coin Wrap Service - new | $0.00 | | $300,000.00 |
| Active | 11/1/2008 | VACU 14 Fredricksburg | 9951 Jefferson Davis Hwy. | Fredericksburg | VA | Armored Transportation | $82.22 | 10 | $300,000.00 |
| Active | 3/27/2008 | VA CU Fredericksburg VA | 9951 Jefferson Davis Hwy. | Fredericksburg | VA | Coin Wrap Service - new | $0.00 | | |
| Active | 11/1/2008 | Virginia Credit Union | 2150Gordon W Shelton Blvd | Fredericksburg | VA | Armored Transportation | $82.22 | 10 | $300,000.00 |
| Active | 10/1/2008 | Virginia Credit Union | 2150Gordon W Shelton Blvd | Fredericksburg | VA | Coin Wrap Service . | $0.00 | 0 | $300,000.00 |
| Active | 5/26/2009 | Virginia Credit Union #19 | 13025 Jefferson Davis Hwy | Chester | VA | Armored Transportation | $196.62 | 10 | $300,000.00 |
| Active | 5/26/2009 | Virginia Credit Union #19 | 13025 Jefferson Davis Hwy | Chester | VA | Coin Wrap Service . | $0.00 | 0 | $300,000.00 |

(** Flagged for GARDA CL internal purposes only.)

The following rate schedule applies to the service locations listed above:

| | | |
|---|---|---|
| **Product | | |
| Coin Wrap Service . | | |
| Description | Price ($) | Unit of Measure |
| ORDER PER ROLL (COIN) $ | 0.042 | Unit |
| DEPOSIT MIX COIN BAG $ | 5.3 | Occurrence |
| | | |
| **Product | | |
| Armored Transportation | | |
| Description | Price ($) | Unit of Measure |
| Input: Maximum Shipment Liability ($) | 300000 | Dollar |
| Input: Maximum Shipment Liability Checks* ($) | 10000 | Dollar |
| EXCESS COIN BAG/BOX $ | 0.27 | Bag/Box |
| OFF DAY IN-ROUTE $ | 37.13 | Trip |
| DEDICATED ARMORD CAR SERVICE (2 Hour Min) $ | 118.45 | Hour |
| RETURN TRIP SERVICE $ | 46.35 | Trip |
| EXCESS LIABILITY ($000's) $ | 0.32 | per $'000's |
| EXCESS PREMISE TIME $ | 1.33 | Minute |
| HOLIDAY SERVICE $ | 47.74 | Trip |
| | | |
| **Product | | |
| Coin Wrap Service - new | | |

(** Flagged for GARDA CL internal purposes only.)

GARDA

* [N] By placing a "Y" in this box, CUSTOMER agrees and confirms that it captures such information as it deems necessary to fully Reconstruct all checks in each Shipment. Accordingly, CUSTOMER, subject to Section XI(f) of the Agreement, declines any coverage by and waives any liability against CARRIER above the amount set forth as the Maximum Shipment Liability Checks in exchange for not being assessed any excess liability charges for checks included in any Shipment above the Maximum Shipment Liability Checks amount. Otherwise, by placing an "N" in this box, the terms of Sections X(a) and XI(f) will apply and additional and excess liability charges will be assessed for amounts in excess of the Maximum Shipment Liability Checks .

**(IV) Days of Service**

| **Service Location | City | State | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|---|---|
| VIRGINIA CREDIT UNION | RICHMOND | VA | N | Y | N | N | Y | N | N |
| VIRGINIA CREDIT UNION | RICHMOND | VA | N | Y | N | N | Y | N | N |
| VIRGINIA CREDIT UNION | RICHMOND | VA | N | Y | N | N | Y | N | N |
| VIRGINIA CREDIT UNION | Mechanicsville | VA | N | Y | N | N | Y | N | N |
| VIRGINIA CREDIT UNION | RICHMOND | VA | N | Y | N | Y | N | Y | N |
| VIRGINIA CREDIT UNION | RICHMOND | VA | N | Y | N | Y | N | Y | N |
| VIRGINIA CREDIT UNION | MIDLOTHIAN | VA | N | Y | N | N | Y | N | N |
| VIRGINIA CREDIT UNION | RICHMOND | VA | N | Y | N | N | Y | N | N |
| VIRGINIA CU (RS6000) | RICHMOND | VA | N | Y | N | N | Y | N | N |
| VIRGINIA CU (RS6000) | Colonial Heights | VA | N | Y | N | N | Y | N | N |
| VACU Farmville #16 | Farmville | VA | N | N | N | Y | N | N | N |
| VACU 14 Fredricksburg | Fredericksburg | VA | N | N | N | Y | N | N | N |
| Virginia Credit Union | Fredericksburg | VA | N | N | N | Y | N | N | N |
| Virginia Credit Union #19 | Chester | VA | N | Y | N | N | Y | N | N |

(**Flagged for GARDA CL internal purposes only.)

**Carrier**

Garda CL Atlantic, Inc.

By: David Rugani
(Signature)

David Rugani
(Printed Name)

Title: Contracts Administration

**Customer**

VIRGINIA CREDIT UNION

By: William R. Jones
(Signature)

William R. Jones
(Printed Name)

Title: SVP Operations

# Addendum to Service Agreement

This Addendum is made by and between Virginia Credit Union, Inc., a financial institution of the Commonwealth of Virginia, headquartered at 7500 Boulders View Drive, Richmond, VA 23225 ("VACU") and GARDA CL ATLANTIC, INC. with offices located at 4200 Governor Printz Drive, Wilmington, DE 19802 ("GARDA"), each referred to individually herein as a "Party" and collectively the "Parties". This Agreement is intended to clarify and add certain provisions for the GARDA Armored Car Service Agreement with Cash Processing dated as of August 1, 2009 between these two Parties ("Service Agreement").

Whereas the Parties are contemplating or have already entered into a business relationship, they agree as follows:

1. Term. Covered in Section I of Schedule A of the Service Agreement. VACU agrees to a price increase of three percent (3%) per year in years 2 and 3 of the Service Agreement.

   New service locations can be added during the term of the agreement and invoiced on a pro-rated basis.

   Should either Party wish to discontinue the Service Agreement following the initial term of the Service Agreement, the initiating Party must submit written notice thereof thirty (30) days in advance as described in Schedule A.

2. Payment. Covered in the Service Agreement, Section I, (5)

3. Assignment. No portion of the agreement between VACU and GARDA can be assigned to a third party without VACU's written consent, except as provided in Section XII(c) of Attachment I to the Service Agreement.

4. Confidentiality. "Confidential Information" means non-public and/or proprietary materials and information of, or in the possession of, the VACU which is disclosed to or obtained by GARDA in the process of performing its obligations under that certain Service Agreement and which is: (i) marked or otherwise tangibly identified as confidential in nature at the time of disclosure, (ii) if communicated verbally, identified as confidential at the time of disclosure and within 14 days after disclosure confirmed in writing to the Receiving Party as being confidential in nature, or (iii) Consumer Personal Information protected by the Privacy Laws.

   "Consumer Information" means personal financial information relating to one or more of VACU's customers and includes information about any person who obtains or seeks to obtain a financial product or service from VACU.

   Notwithstanding the foregoing, the obligations set forth in this Agreement do not apply to material or information, other than Consumer Information, that: (i) is already or otherwise becomes generally known by third parties as a result of no act or omission of the Service Provider; (ii) subsequent to disclosure hereunder is lawfully received from a third party having the right to disseminate the information without restriction on disclosure; (iii) is generally furnished to others by VACU without restriction on disclosure; (iv) is verified by written documentation as already known by the Service Provider prior to receipt from VACU and was not received from a third party in breach of a confidentiality obligation; or (v) is independently developed by the Service Provider without the use of Confidential Information of VACU.

   Parties understand that the release of Confidential information may be necessary to carry out the services and obligations required pursuant to a valid contract or signed agreement between Parties, and that such a release shall not be considered a breach of this confidentiality provision, provided that the disclosure is made in accordance with federal and state law.

VACU requires adherence to all laws applicable to the protection of consumer information, including, but not limited to "Title V of the Gramm-Leach-Bliley Act (GLBA), and the National Credit Union Administration (NCUA) Privacy Rules, 12 CFR Part 716, and 12 CFR Part 748 (the "Privacy Laws").

Service Provider acknowledges that services do involve the transfer of Confidential information and agrees: (1) that it shall not disclose Confidential Information, without permission from VACU, to any [a] nonaffiliated third party, or [b] affiliated party without just cause, necessity or purpose; (2) to limit access to Confidential Information to only the person or persons necessary to carry out the agreed upon services and obligations; (3) that the provisions of this Agreement shall continue for a period of two years after the termination of the above referenced Service Agreement for Confidential Information except that for Consumer Information the obligation set forth herein shall survive indefinitely after the termination of the Service Agreement; (4) to maintain as Confidential any and all Confidential information obtained from VACU; (5) to observe applicable state and federal law in the use, retention and destruction of Confidential Information; (6) to implement appropriate measures designed to protect against unauthorized access to or use of Confidential Information; (7) to promptly destroy or return to VACU, upon request or upon termination of the relationship between the Parties, all Confidential Information and copies thereof; (8) to use the same degree of care to avoid publication, disclosure, or dissemination of the Confidential Information as it would with respect to its own confidential information; (9) that upon discovery of any unauthorized access to or disclosure of Confidential Information, to take any necessary and reasonable action to prevent further disclosure and to notify VACU promptly of such incident; (10) that if requested by VACU, to provide reasonable evidence that the obligations of this Agreement are being fulfilled, and (11) that in the event of any legal action between Parties, venue shall be in the courts of the Commonwealth of Virginia.

5. Security. GARDA will notify VACU within 48 hours or less and fully disclose to VACU any known or suspected security faults involving equipment covered in this service agreement that may pose a threat to VACU's financial operations, along with the corrective action to respond to the fault.

6. Service Scope. The contracted service to be performed by GARDA personnel is for the Armored Transportation Service of branch cash, coin and negotiable items to VACU locations listed in Schedule A or contracted in writing for special circumstances.

7. Indemnification. Covered in the Service Agreement, Section IX (a).

8. Continued Service. In the event of a dispute between both Parties regarding services to be performed under the Service Agreement, GARDA agrees to continue providing services to VACU as stated in the Service Agreement and VACU agrees to pay GARDA for such services as outlined in the Service Agreement during any dispute.

9. Insurance. Covered in the Service Agreement, Section VII. All Risk Policies cover fraud & dishonesty by Garda Employees in regards to services provided to VACU.

10. Garda Staff. All Garda employees who have access to VACU funds are subject to background checks, including criminal, credit, drugs and firearms.

11. Change to Cost Structure. Covered in the Service Agreement, Section XII (b) and Schedule A.

12. Business Recovery. GARDA will be responsible for backing up all records associated with the VACU servicing. GARDA will use commercially reasonable efforts to support VACU DR/BCP requirements within the scope of GARDA services. GARDA will provide VACU with a summary of its up to date Business Continuity Plan & Pandemic Preparedness Plan and a summary of its documented testing as requested.

13. Facility Inspection. VACU may inspect GARDA's local processing facilities and operating practices, subject to facility security and confidentiality regulations and policies and to the extent that such

practices are limited to that of services provided to VACU, after giving GARDA a minimum of 48 hours written notice and confirmation by GARDA.

14. Service Level Agreement. GARDA will provide Armored Cash Transportation Service as outlined in the Service Agreement, Section III (a) to VACU branches based on Schedule A during normal business hours.

    VACU will review GARDA's performance on an annual basis in order to report and/or resolve and deficiencies reported by VACU or GARDA.

15. Disputes. In the event that VACU and GARDA have a dispute that is not covered by the Service Agreement both VACU and GARDA agree to go to arbitration and follow the rules of the American Arbitration Association and abide by the decision of the arbitrator.

16. Termination. VACU reserves the right to terminate the Service Agreement without penalty under the following conditions:
    - Gross negligence or intentional misconduct by GARDA leading to a negative impact on VACU financial operations;
    - Failure to provide the Service Level Agreement Standards as listed in the Service Agreement; or
    - Failure to maintain acceptable & sufficient Insurance Coverage's as Covered in the Service Agreement.

The signer of this Addendum represents and warrants that he or she is duly authorized by an applicable bylaw, Article or other Corporate Authority to enter into transactions of this nature.

In witness whereof, the parties hereto have, by their duly authorized representatives, executed this Addendum effective as of the latest date set forth below.

**Virginia Credit Union, Inc.**

William R. Jones
(Signature of Authorized Individual)

William R. Jones
(Printed Name of Authorized Individual)

December 10, 2009
(Date)

**GARDA CL ATLANTIC, INC.**

David Rugani
(Signature of Authorized Individual)

David Rugani
(Printed Name of Authorized Individual)

1/11/10
(Date)